_____

TONI MARIE NICOLIA,

                                Plaintiff,                    DECISION AND ORDER

vs.

                                                    16-CV-6368 CJS

GENERAL MOTORS, LLC,

                              Defendant.

_____

## APPEARANCES

| | |
|---|---|
| For Plaintiff: | James D. Hartt<br>70 Linden Oaks, Third Floor<br>Rochester, New York 14625 |
| For Defendant: | Marlo Johnson Roebuck<br>Jackson Lewis PC<br>2000 Town Center, Suite 1650<br>Southfield, Michigan 48075 |

## INTRODUCTION

This is an action assertion retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  Now before the Court is Defendant's motion for summary judgment (Docket No. [#34]).  The application is granted.

## BACKGROUND

Before setting forth the facts of this action the Court will briefly review the relevant procedural rules concerning summary judgment motions.  It is of course well settled that summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993).

However, with regard to the well-settled rule that the Court must view the "facts" in the light most-favorable to the non-moving party, not every assertion by the non-moving party is a "fact" that must be accepted as true. For example, the party opposing summary

judgment (as well as the movant) must properly support his or her factual assertions with

citations to the record.  In this regard, Fed. R. Civ. P. 56(c) states, in pertinent part:

> (1) **Supporting Factual Positions**.  A party asserting that a fact cannot be or is genuinely disputed <u>must support the assertion by</u>:
>
> (A) <u>citing to particular parts of materials in the record</u>, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B) (emphasis added).[1]

Additionally, Rule 56(a) of this District's Local Rules of Civil Procedure states:

> (1) Movant's Statement. Upon any motion for summary judgment pursuant to Fed.R.Civ.P. 56, there shall be annexed to the notice of motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. <u>Each such statement must be followed by citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed.R.Civ.P. 56(c)(1)(A)</u>. Citations shall identify with specificity the relevant page and paragraph or line number of the evidence cited. Failure to submit such a statement may constitute grounds for denial of the motion.
>
> (2) Opposing Statement. The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. <u>Each numbered paragraph in the moving party's statement of material facts may be deemed</u>

---

[1] *See, DeSimone v. Quicken Loans, Inc.*, No. 1:09-CV-01421-WTL, 2011 WL 2470661, at *2 (S.D. Ind. June 20, 2011) ("[T]he court considers the portions of the expanded record which comply with the requirements of Rule 56(c) to determine which facts are undisputed for purposes of the motion for summary judgment, or if disputed, considers those facts in the light most favorable to the non-movant[.]").

admitted for purposes of the motion unless it is specifically controverted by a corresponding numbered paragraph in the opposing statement.

(3) Appendix. All cited evidence, such as affidavits, relevant deposition testimony, responses to discovery requests, or other documents, that has not otherwise been filed in conjunction with the motion shall be filed as an appendix to the statement of facts prescribed by subsections (1) or (2), supra, in conformity with Fed.R.Civ.P. 56(c)(1)(A), and denominated "Plaintiff's/Defendant's Appendix to Local Rule 56 Statement of Material Facts."

Local Rules of Civil Procedure, Rule 56(a) (emphasis added).

The non-movant cannot oppose a properly-supported summary judgment motion with bald assertions that are not supported by the record. *See, Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."), *as amended on denial of reh'g* (Dec. 22, 1999); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 980 F. Supp. 2d 425, 459 (S.D.N.Y. 2013) ("[U]nsupported argument is not evidence, and cannot defeat summary judgment."). Rather, as noted previously, the non-movant must "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).[2]

Of course, the record may include the non-movant's own affidavit, provided that the affidavit is based on personal knowledge and does not contradict the affiant's prior sworn statements.[3] More specifically in this regard, affidavits and sworn declarations

---

[2] *See also, Olutosin v. Lee*, No. 14-CV-00685 (NSR), 2018 WL 4954107, at *8 (S.D.N.Y. Oct. 12, 2018) ("The non-movant must support his assertion by 'citing to particular parts of materials in the records' or 'showing that the materials cited do not establish the absence ... of a genuine dispute.' Fed. R. Civ. P. 56(c)(1)."); *Paniagua v. Walter Kidde Portable Equip., Inc.*, 183 F. Supp.3d 473, 480 (S.D.N.Y. 2016) ("Where this initial showing has been made, the burden shifts to the non-movant to establish a genuine issue of fact by 'citing to particular parts of materials in the record.' Fed. R. Civ. P. 56(c)(1)(A).").

[3] *See, Curtis v. Cenlar FSB*, 654 F. App'x 17, 20 (2d Cir. 2016) (Indicating that allegations in an affidavit "can suffice to defeat summary judgment only insofar as they were made on personal knowledge.");

submitted in connection with a summary judgment motion must comply with Rule 56(c)(4), which states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

A court may decline to consider an affidavit or sworn declaration that does not does not comply with Fed. R. Civ. P. 56(c):

> Where an affidavit or declaration contains material that does not comply with Rule 56(c)(4), a Court may either disregard or strike it from the record. Where an affidavit is more akin to an adversarial memorandum than a bona fide affidavit, a court may, in considering a motion for summary judgment, simply decline to consider those aspects of the affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible.

*Madden v. Town of Hempstead*, No. 16-CV-6835(SJF)(AKT), 2019 WL 1439935, at *11 (E.D.N.Y. Mar. 29, 2019) (citations and internal quotation marks omitted). A court may also decline to consider statements in the non-movant's affidavit that either contradict his prior sworn statements, are not based on personal knowledge or are otherwise inadmissible. *See, e.g., Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013) ("[A] court may, in considering a motion for summary judgment, simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible.").

The Court has reviewed these basic principles because while Defendant's papers comply with Rule 56(c) and Local Rule 56(a)(1), Plaintiff's opposition papers do *not*

---

*see also, Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Although a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony, a material issue of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation.") (citations omitted).

comply with Fed. R. Civ. P. 56(c)(1) or Local Rule 56(a)(2). That is, in response to Defendant's properly-supported Statement of Facts [#34-8], Plaintiff has not submitted "a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs," supported by citations to the record. Instead, Plaintiff has purported to include a counter-statement of facts within her memorandum of law, consisting of a sentence purporting to incorporate by reference her own affidavit [#44-2].[4] Plaintiff's affidavit, in turn, offers her response to each of the 65-paragraphs in Defendant's statement of facts, but without any citations to the record.[5] Consequently, Plaintiff's purported affidavit/counter-statement of facts consists largely of her subjective opinions, beliefs and understandings concerning matters such as the terms of the written collective bargaining agreement ("CBA") between General Motors ("GM") and the United Auto Workers ("UAW"), and General Motor's safety policies and labor rules, unsupported by citations to the actual CBA, policies or rules. Beyond that, Plaintiff has also included within her memorandum of law a purported "Separate Statement of Facts,"[6] consisting of 46 paragraphs that are, for the most part, conclusory arguments rather than statements of fact.[7] [8] Additionally, in some instances Plaintiff's affidavit contradicts her prior sworn

---

[4] See, Docket No. [#44] at p. 4.

[5] Obviously this is not a legitimate method of complying with the local rule, since it eviscerates the requirement that statements of fact be supported by citations to the record.

[6] Docket No. [#44] at pp. 4-13.

[7] For example, paragraph 2 of Plaintiff's purported "Separate Statement of Facts" states in pertinent part: "In direct and proximate retaliation for having filed New York State Division of Human Rights Case No. 10155645, Defendant harassed Plaintiff, subjected her to a hostile work environment, subjected her to multiple forms of undeserved discipline and ultimately terminated Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, as amended." That is a conclusory assertion, not a statement of fact.

[8] There is no excuse for any of this, since prior to the filing of Plaintiff's opposition papers in this action, numerous district courts had already commented on similar failures by Plaintiff's counsel, Mr. Hartt, to comply with the federal and local rules governing statements of fact submitted in opposition to summary judgment motions. *See, e.g., Atkins v. Rochester City Sch. Dist.*, 6:15-CV-06498 EAW, 2018 WL 1582238 at *2, n. 1 (W.D.N.Y. Mar. 30, 2018) ("Plaintiff's affidavit in response to Defendant's Rule 56 statement does not conform to the requirements of Local Rule of Civil Procedure 56(a). Plaintiff's responses to Defendant's

deposition testimony.[9]

Consequently, pursuant to Rule 56(e) and Local Rule 56(a)(2), the Court deems Defendant's statements of fact to be admitted for purposes of this Decision and Order, except insofar as particular assertions may be controverted by a non-hearsay sworn statement in Plaintiff's affidavit that appears to be based on her own knowledge (as opposed to her speculation, opinions, conclusions, understandings or interpretations, and insofar as it is not hearsay and does not contradict here prior sworn testimony), or by an

---

statements do not consistently pertain specifically to the factual allegations in the corresponding statement, and Plaintiff includes facts that are irrelevant, not in dispute, and are duplicative of the facts in Defendant's statement."); *Hill v. Frontier Telephone of Rochester, Inc.*, 15-CV-6212-FPG, 2018 WL 1256220 at *1, n. 1 (W.D.N.Y. Mar. 12, 2018) ("Plaintiff also submits what is captioned as 'Plaintiff's Separate Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment. Although the Court has reviewed this submission, it notes that the submission does not comport with the Local Rules of Civil Procedure[.]"); *Rehkugler v. Aetna Life Ins. Co.*, 5:16-CV-0024 (GTS/ATB), 2017 WL 3016835 at *1-2 (N.D.N.Y. Jul. 14, 2017) ("As an initial matter, a few words are appropriate with respect to the manner in which the parties' motions were briefed. . . . Although Plaintiff did not file a separate statement of material facts ('Rule 7.1 Statement'), the Court construes Part II of his memorandum of law – which consists of purported factual assertions . . . to be a Rule 7.1 Statement. However, the Court notes that several of Plaintiff's purported factual assertions constitute improper legal arguments, are worded in a manner that misleadingly characterizes the record citation provided, or are broad assertions not supported by a specific citation to the record. Plaintiff is respectfully reminded that a statement of material facts must 'set forth, in number paragraphs, each material *fact*,] and must set forth a *specific* citation to the record where the *fact* is established.'") (emphasis in original; citations omitted); *Timmel v. West Valley Nuclear Services Co.*, No. 09-CV-5S, 2011 WL 5597350 at *10 (W.D.N.Y. Nov. 17, 2011) ("In the present case, Plaintiff has submitted a statement of facts as part of its memorandum of law. However, instead of citing to the lengthy exhibits attached thereto, Plaintiff instead plagiarizes his complaint to support his factual assertions. A complaint is not admissible to prove the truth of its contents.").

[9] The most notable example of this is when Plaintiff asserts in her affidavit that two of the individuals involved in the decision to terminate her employment, Philip Popielski and John Caporuscio, acted with "retaliatory animus" toward her, Docket No. [#44-2] at p. 9, Pl. Aff. at ¶ 56, while at her deposition, when asked to name every person at GM who had retaliated against her, Plaintiff named several individuals but not Caporuscio or Popielski, Pl. Dep. at p 28, Docket No. [#34-3] at p.4 (Identifying Sullivan, Kirkendale and West as the only persons who retaliated against her), even though Caporuscio was sitting at the table across from her during the deposition, Pl. Dep. at p. 7, Docket No. [#34-3] at p. 3, and even though Popielski was discussed at length during her deposition. As another example, Plaintiff's affidavit denies that Joelle Wilson identified her as the person that had assaulted her, stating, "Joelle Wilson alleged she was assaulted by an unknown person. . . . Joelle Wilson never identified who assaulted her[.]" Pl. Aff. at ¶ 12. However, at her deposition Plaintiff admitted that Joelle Wilson told Sullivan that Plaintiff assaulted her. Docket No. [#34-3] at p. 21, Pl. Dep. at p. 122 ("Q. [W]hen did it first come to your attention that Joelle was saying that, you know, you yelled at her, you used profanity or you pushed her? A. Probably about an hour, hour and a half later. Q. And who told you that? A. Kevin Sullivan walked up to me and said you're on notice and I said for what and he said assault[.]") .

actual statement of fact (as opposed to legal argument) in Plaintiff's purported "Separate Statement of Facts" that is supported by a citation to the record.

With that understanding, the following are the facts of the case. Prior to January 2013, Plaintiff was employed at GM Components Holding ("GMCH") in Rochester, New York. Plaintiff was employed as a "Journeyman Pipefitter."[10]

On June 19, 2012, Plaintiff filed a discrimination complaint against GMCH with the New York State Division of Human Rights ("NYSDHR").[11] On the 4-page form complaint supplied by NYSDHR, Plaintiff indicated that she had experienced discrimination on the basis of her sex by three male supervisors, Ed Hilton ("Hilton"), Paul Murty ("Murty") and Noel Johnson ("Johnson"), consisting of harassment and intimidation "(other than sexual harassment)," denial of training, assignment of worse jobs than other workers, and denial of overtime.[12] However, the complaint went far beyond describing the alleged discrimination by Hilton, Murty and Johnson. In this regard, attached to the form complaint was a 23-page addendum, resembling a stream-of-consciousness critique of all aspects of Plaintiff's employment at GMCH. A recurring theme throughout the lengthy narrative was Plaintiff's belief that neither her co-workers nor her supervisors respected her abilities or trusted her to perform her job correctly. For example, Plaintiff repeatedly referred to "peers" complaining about her and filing grievances against her for various reasons.[13] More specifically, for instance, Plaintiff

---

[10] Docket No. [#34-5] at p. 87.

[11] Docket No. [#34-5] at pp. 85-112.

[12] Docket No. [#34-5] at pp.85, 87.

[13] See, e.g., Docket No. [#34-5] at pp. 92, 93, 99 ("My peers don't like it if I work in their areas of leave them turnovers. . . . If they are told to help by a supervisor and have to help they will complain . . . and then I will be subjected to counseling based on these complaints which have been levied by my peers . . . My peers point out anything they feel I did that doesn't meet their expectations and feel I should be disciplined for.").

indicated that on one occasion a peer filed a grievance alleging that she had performed work that was "out of her class" as a pipefitter (Plaintiff admitted that she had worked out of her class, but indicated that it had been necessary to get the job done more quickly.)[14] Plaintiff indicated that she also filed grievances against her co-workers.[15] The NYSDHR complaint also refers to Plaintiff being "walked out" of the plant on several occasions for disciplinary reasons. For example, Plaintiff indicated that on one occasion she was sent home after she refused to perform work that she felt was unnecessary.[16] Plaintiff stated that on another occasion, she was "walked out" for causing lost production time after she was delayed in installing a valve on a machine due to a mistake in locating a part.[17] Plaintiff's NYSDHR complaint essentially maintains that all of the disciplinary complaints against her were unjustified or overblown, and that her union representatives had failed to stand up for her. Nevertheless, the NYSDHR complaint indicates that even before Plaintiff ever engaged in protected activity at work, there was significant acrimony and distrust between herself, her co-workers and her supervisors at GMCH, as well as a pattern of disciplinary complaints and actions against her, although she disputes the legitimacy of the disciplinary actions.[18]

In January 2013, Plaintiff left GMCH and went to work for General Motors, LLC ("GM") in Tonawanda, New York. GM maintains that GM and GMCH are "two distinct

---

[14] Docket No. [#34-5] at pp. 99-100.
[15] See, e.g., Docket No. [#34-5] at p. 102 ("I wrote John W. up for doing my job.").
[16] Docket No. [#34-5] at p. 95.
[17] Docket No. [#34-5] at p. 102.
[18] The NYSDHR complaint against GMCH did not allege retaliation, because prior to that complaint she had apparently not engaged in protected activity.

companies," but Plaintiff contends that GMCH is a subsidiary of GM, and that her move to GM was essentially an intra-company transfer. The Court accepts Plaintiff's contention for purposes of this Decision and Order.

At all relevant times, GM maintained a 7-step progressive discipline policy that was part of the relevant CBA between GM and the UAW.[19] The first step was a written reprimand and the seventh step was discharge from employment, but steps in between could be skipped depending upon the severity of conduct. Pursuant to the CBA, grounds for discipline included disregarding safety rules, threatening or intimidating co-workers, making scrap unnecessarily and failing to perform job assignments.[20]

At the Tonawanda Plant, Plaintiff no longer worked as a pipefitter, but instead, she worked in "production." This was not a demotion, however; rather, Plaintiff intentionally sought a job at the Tonawanda plant in production because she wanted to work at that plant, and there were no "skilled trade" positions available.[21] At the Tonawanda Plant Plaintiff was initially assigned to the GEN V engine assembly line as an assembler. A few months later Plaintiff transferred to LGE Head Machining, where she worked as a machine operator. Plaintiff's group leader in the LGE Head Machining group was Kevin Sullivan ("Sullivan").

Plaintiff's first ten months at the Tonawanda Plant were apparently uneventful, meaning that Plaintiff does not complain of any retaliation by GM. During this period, in August 2013, Plaintiff and GMCH reached a settlement concerning Plaintiff's NYSDHR complaint. Prior to this settlement, Plaintiff had asked for time off from work to attend

---

[19] Docket No. [#34-4] at p. 13.
[20] Def. Stmt. of Facts [#34-8] at ¶ 4; Docket No. [#34-4] at pp. 11-12.
[21] Pl. Dep. at 39-40.

"court," though there is no evidence that she stated the nature of the court appearance or that she specifically stated that the appearance involved a complaint against GMCH.[22] (Plaintiff never actually had to attend a court proceeding, because the matter settled. At most, it appears that Plaintiff took a break to participate in a telephone conversation with her attorney, who was at a court.)[23] Nevertheless, Plaintiff speculates that various people at GM became aware of her complaint against GMCH as a result of her asking for time off.[24] For example, Plaintiff maintains that anyone who was involved in considering or approving her request for time off, including the supervisor to whom she made the request and anyone standing nearby when she made the request, would have learned from such request that she had filed a complaint against GMCH.[25]

Shortly after the settlement of Plaintiff's NYSDHR complaint against GMCH, during the fall of 2013,[26] Plaintiff began to complain about harassment by a female co-worker,

---

[22] Pl. Dep. at p. 236 ("[I said] [t]hat I had the potential for a court hearing and I believed it was going to be in Rochester.").

[23] The specifics of this incident, and of various other matters at issue in this action, are not entirely clear, partly because Plaintiff repeatedly gave evasive and non-responsive answers at her deposition. *See, e.g.*, Pl. Dep. at 234 ("A. I had court appearances that I had to leave work or go off plant property to participate in phone calls. So they were aware of it because I had to ask permission to leave. Q. That was -- you're saying that you had to go to court for that matter? A. I had – I had to go to court. Q. What court did you go to regarding that matter? A. The phone calls were done over with the judge and stuff in New York City. . . . Q. But there was no court hearings, correct? A. They settled out of court. . . . Q. So you didn't actually have to leave the plant to go to any court hearing, correct? A. For the phone interview with the court in Ne York City. My lawyer was there, their lawyer was there, and I was on the phone with the teleconference."); *see also, id.* at 73-76 ("Q. Is it fair to say, based on your answers, that you did not tell Jodi West that Joelle was creating a hostile environment because of your age? A. Age is not a criteria for holding a job at GM. Q. Did you tell Jodi West that Joelle was creating a hostile work environment because of your race? A. Race is not a criteria for holding a job at GM. . . . Q. Did you tell Jodi that Terry Gariss was discriminating against you because of your race? A. Race is not a basis of job assignment or job interaction at GM. Q. Did you tell Jodi that Terry Gariss was discriminating against you because of your gender? A. Gender is not a basis of job assignment or job interaction."). Other examples of this can be found at Pl. Dep. at pp. 59-60 and 62-64, where Plaintiff repeatedly refused to answer simple questions, instead responding with her own argumentative editorial statements. It clearly appears to the Court that in many instances Plaintiff intentionally hindered Defense Counsel's efforts to conduct her deposition.

[24] Pl. Dep. at 234 ("[T]he were aware of it because I had to ask permission to leave.").

[25] Pl. Dep. at 235-240.

[26] Pl. Dep. at pp. 69, 71.

Joelle Wilson ("Joelle"). Plaintiff made the complaints to Jodi West ("West"), "a labor relations liaison."[27] Plaintiff told West that Joelle, who was apparently often accompanied by a male co-worker, Terry Garris ("Terry"), "was coming into [her] work area and arbitrarily doing things."[28] Specifically, Plaintiff complained that Joelle was touching Plaintiff's machine without her permission, and attempting to tell Plaintiff how to do her job.[29] Plaintiff did not allege that Joelle's "harassment" was retaliatory or based on any protected category such as age, sex or race; rather, she alleged that it was based on Joelle's desire to be "the top cat, the top person in the area, even if she didn't have the qualifications for it."[30]

On October 24, 2013, at Plaintiff's work station in LGE Head Machining, she had an interaction with Joelle that resulted in both women being suspended. The incident began when Plaintiff's machine stopped working due to "a fault." When such a fault would occur, the machine operator would typically need to clear the fault by pressing buttons on the machine's control screen. In this instance, Plaintiff maintains that she was unable to clear the fault, and that she left the area to summon an electrician. According to Joelle, she observed that Plaintiff's machine was stopped, and she attempted to clear the fault because she was an acting supervisor at the time, and she did not see Plaintiff in the vicinity. According to Joelle, she was attempting to clear the machine's fault when Plaintiff pushed her and told her to "get the F--- away from my machines, and I do not need your

---

[27] Pl. Dep. at p. 67.
[28] Pl. Dep. at p. 70.
[29] Pl. Dep. at pp. 70, 83-84; *see e.g., id.* at p. 84 ("She was not supposed to be touching my stuff.").
[30] Pl. Dep. at pp. 72-73, 76. Such complaints were therefore not protected activity under Title VII, since Plaintiff could not have reasonably believed that she was complaining about conduct covered by Title VII.

F--- help." Joelle reported this incident to Sullivan, the group leader. Sullivan interviewed Plaintiff, who denied Joelle's version of events. Plaintiff admitted that she was not present when Joelle began pressing buttons on the machine, and that when she saw Joelle in her work area she told her to stop what she was doing and leave, but she denied using profanity or touching Joelle.[31] Plaintiff admits that Joelle had claimed to be acting in the capacity of "backup team leader" because the team leader was absent, but Plaintiff contends that there is no such role of backup team leader.[32] Sullivan sent both Plaintiff and Joelle home pending further investigation. The following day Sullivan investigated further. Witnesses told Sullivan that an altercation between Plaintiff and Joelle had occurred, but they were unsure how it had started. Ultimately, following the procedures contained in the CBA, management suspended both Wilson and Plaintiff for a "balance of shift" ("BOS") plus one week, which equated to the fourth step of the aforementioned seven-step progressive discipline process.[33]

A few weeks later, on November 8, 2013, another employee, Terry, mentioned earlier, told Sullivan that he had observed Plaintiff inside of her machine (a "Head Machining Mod 2") without her lock on the power source to the machine.[34] It is undisputed that it is a safety violation for an employee to be inside a machine without turning off/locking out the power source, since someone else could come along and turn on the machine while the employee is inside the machine.[35] Plaintiff acknowledged that the

---

[31] Pl. Dep. at p. 121.
[32] Pl. Dep. at pp. 125-126.
[33] Def. Stmt. of Facts [#34-8] at ¶ 5. Although both Plaintiff and Wilson received the same suspension, Plaintiff contends that Wilson's punishment was lesser, since she was later allowed to work a weekend that made up for the hours that she lost during the suspension. Pl. Dep. at pp. 129-134.
[34] See, Pl. Dep. at p. 146 (It was alleged that, "employee violated the lockout on November 8th, 2013. Employee was observed inside the Op 80 and head machine, Mod 2.").
[35] Pl. Dep. at pp. 147-148.

machine had a problem and was being serviced at the time of the alleged offense, but denied that she had been observed in the machine.[36]  In that regard, Plaintiff contended that she did not need to lock out the machine, since an electrician working on the machine had locked it out,  and since she had not been inside the machine.[37]  Plaintiff admits, though, that Terry told Sullivan that he had seen her inside of the machine, [38] and that Sullivan relied on Terry's statement in concluding that she had violated the lock-out rule.[39] In this regard, Plaintiff states that "Kevin Sullivan had been misinformed" about the incident.[40]  Ultimately, management determined that Plaintiff had violated the safety rule, and, pursuant to the procedures in the CBA, imposed a penalty of balance of shift plus two weeks, which equated to the fifth step of the seven-step progressive discipline process.[41]

Shortly thereafter, on November 18, 2013, Sullivan cited Plaintiff for "making unnecessary scrap/careless workmanship," alleging that she had mistakenly run the same group of parts through the same machine twice, resulting in defects.  Plaintiff acknowledges that she had loaded parts into "the line," and then re-loaded them after an electrician had removed them to work on a machine, and that she was subsequently accused of having re-entered the parts in the wrong location.[42]  However, Plaintiff denies that she made the error alleged.  Indeed, Plaintiff asserts, based on her understanding, that running the same part through the same machine process twice either could not

---

[36] Pl. Dep. at p. 148.
[37] Docket No. [#44-15] at pp. 13-15, Pl. Dep. at pp. 148-150.
[38] Docket No. [#44-2] at p. 4, ¶ 15.
[39] Docket No. [#44-2] at p. 4, ¶ 18.
[40] Pl. Aff. at ¶ 15.
[41] Def. Stmt. of Facts [#34-8] at ¶ 5.
[42] Docket No. [#34-5] at pp. 127-128

occur, or would not result in a manufacturing defect. Plaintiff demanded to see the defective parts and was eventually shown a pallet of such parts. However, Plaintiff insists that there was no evidence linking her to the damaged parts.[43] Nevertheless, pursuant to the procedures in the CBA management imposed a penalty of balance of shift plus thirty days, which equated to the sixth step of the seven-step progressive discipline process.[44] At that point, management verbally cautioned Plaintiff that she was in a "last chance" situation,[45] and that the next step in the progressive discipline process would be termination.

Plaintiff subsequently requested and obtained a transfer to the Global Supply Chain ("GSC") unit in Gen V, 2nd shift. Plaintiff believed that by transferring she would negate the disciplinary strikes that she had accumulated while in LGE Head Machining. In other words, Plaintiff believed, and still maintains, that the transfer gave her a clean disciplinary slate, though she has cited no CBA provision, policy, agreement, or anything else, to support that contention.[46]

In her new position at Gen V GSC, 2nd shift, Plaintiff became "a mobile equipment delivery operator responsible for delivering material to the machining departments and assembly lines."[47] Matt Kirkendale ("Kirkendale") was a group leader in that area at the time, but Plaintiff contends that she never actually was assigned to work for Kirkendale.[48] A general foreman and shift leader in GSC 2nd shift was Walter "Wally" Klubek

---

[43] Docket No. [#34-5] at pp. 127-128.
[44] Def. Stmt. of Facts [#34-8] at ¶ 5.
[45] Pl. Dep. at p. 230-231. Plaintiff indicates that Klubek informed her that she was on her last chance. Pl. Dep. at 230-231, 233.
[46] Pl. Dep. at pp. 100-101, 232.
[47] Def. Stmt. of Facts [#34-8] at ¶ 22.
[48] Pl. Dep. at pp. 102, 174.

("Klubek").[49]

On March 18, 2014, Plaintiff was cited for "failing to follow standardized work procedure" in the assembly station, resulting in mis-delivery of parts and delay in the production process. Who initiated the complaint is unclear from the record, though Kirkendale ultimately co-signed the form imposing the disciplinary penalty, along with Plaintiff's union representative. The particulars of the incident are not entirely clear in the record,[50] but it appears that Plaintiff's failure to follow standardized work procedures was alleged to have included improperly pushing "request buttons," purportedly to avoid having to deliver particular loads of parts. In this regard, Plaintiff described the incident as follows:

> The job screen was backed up the entire time 10-18 jobs, should have been no more than ¾ jobs. I picked up a job in head sub. The previous driver failed to set-up the dollys for the next call. I could not perform the job due to lack of parts. I pressed the button on the pendent on the dolly to generate a call. This call indicated to the dock driver that I had dunnage and needed a full pallet of parts. The screen was backed up but I thought the job would be at the top of the screen by the time I arrived at the dock. I was right but the job was gone from the screen – cherry picking is not allowed in Plant 5 but someone was doing it repeatedly that day. I was put on notice for pressing the button on the pendent on the dolly.[51]

A later statement by Klubek concerning Plaintiff similarly implies that the disciplinary action involved Plaintiff improperly pressing a button: "She holds calls to[o] long, she will take too many calls & deliver late, *she pushes request buttons herself & tr[ies] to hold out*

---

[49] Pl. Dep. at pp. 105-106.

[50] Docket No. [#34-3] at p. 26, Pl. Dep. at pp. 175-176. At her deposition Plaintiff testified that the basis for the charge was never explained to her. However, in her prior sworn NYSDHR complaint, Plaintiff explained the circumstances leading to the disciplinary action, thereby showing that she understood what she was alleged to have done wrong. *See*, Docket No. [#34-5] at p. 128 (NYSDHR Complaint).

[51] Docket No. [#34-5] at p. 128.

*for easier calls*,"[52] and Plaintiff later asserted that she had been "put on notice for pressing the button on the pendent on the dolly."[53]   Plaintiff maintains that she should not have been cited for violating this rule, either because she was being trained at the time, or because there "were no standardized procedures" concerning the work that she was doing.[54]   Plaintiff admits, however, that during the investigation of this disciplinary charge, she asked about standard work procedures, and was told that such written procedures existed, and was told where she could find them, though it does not appear that she consulted them.[55]   In any event, this written citation came after Plaintiff had previously been verbally counseled for violating the same procedure.[56]   However, rather than terminate Plaintiff, which would have been the next step in the progressive discipline process, management again imposed a penalty of balance of shift plus thirty days.[57]   In other words, Plaintiff remained at the same "last chance" step of the progressive discipline process under the CBA.[58]

---

[52] Docket No. [#44-7] at p. 2 (emphasis added).

[53] Docket No. [#34-5] at p. 128.

[54] Docket No. [#44-15] at p. 21-22, Pl. Dep. at p. 177-178 ("[T]here are no standardized work procedures for Eagle to assembly.  It's on-the-job training and if you work with different people, they show you different ways to do the same job.").

[55] Docket No. [#44-15] at p. 21, Pl. Dep. at p. 177 ("I asked where the standard work procedure was that I failed to do and he said it's in the room over there.").  Plaintiff's assertion that General Motors does not have standard work procedures is implausible on its face, even without regard to the contrary evidence submitted by Defendant.

[56] Def. Stmt. of Facts [#34-8] at ¶ 24; see also, Docket No. [#34-4] at p. 6, Caporuscio Aff. at ¶ 24 (Plaintiff had previously been counseled verbally for violating the same procedure).

[57] Plaintiff baldly asserts, without explanation or citation to anything, that her prior discipline in November 2013 had not included a penalty of balance of shift plus thirty days, *see*, Pl. Aff. at ¶ 24, thereby implying that she had not actually been at the last disciplinary step prior to the incident in March 2014.  However, the actual record indicates that the penalty for the November 2013 incident was balance of shift plus thirty days. *See*, Docket No. [#44-8] at p. 6; *see also*, Caporuscio Aff. at ¶ 21, Docket No. [#34-4] at p. 6.

[58] Again, Plaintiff denies that she was at this stage of the disciplinary process, but inasmuch as she failed to comply with the rules regarding statements of fact, Defendant's contrary assertion of fact on this point is unopposed.  Moreover, Plaintiff acknowledges that she was told several times that she was on her "last chance." *See, e.g.*, Pl. Dep. at p. 230 ("I was told repeatedly that I was last chance[.]").

In April 2014, Plaintiff returned to work from her suspension, whereupon she immediately obtained a transfer to a new unit, "3rd shift in GSC Plant 1." In other words, Plaintiff moved from GSC 2nd shift to GSC 3rd shift. Plaintiff's position was as a "mobile equipment delivery operator," which required her to operate delivery vehicles in a warehouse setting. In this position Plaintiff had multiple group leaders, including Tim Drocy ("Drocy") and Vincent Popielski ("Popielski").[59] The shift leader on 3rd shift was John "Jack" Hofstetter ("Hofstetter").[60]

On April 15, 2014, Klubek, Plaintiff's former shift supervisor at GSC 2nd shift, sent an email to Hofstetter, her new shift supervisor of GSC 3rd shift, warning Hofstetter about Plaintiff. Specifically, Klubek stated:

> Jack,
>
> Sending you a quick update on this EE [presumably employee].
>
> Toni has a long history of events & write ups. She was sent to our department [GSC] on a "last chance" agreement between Labor relations & the union.
>
> Basically Toni does not get along well with other EE"s [presumably employees]. She often attempts to notify supvs [presumably supervisors] of what other EE [employees] are doing wrong. Toni will seem helpful at first with supvs' [supervisors] but, you'll find yourself investigating one claim after another. Usually these tips are unreliable. She will attempt to show how well she works but, you'll find her not following the process. She holds calls to[o] long, she will take too many calls & deliver late, she pushes request buttons herself, & try's to hold out for easier calls. She becomes a real pain. As others get to know her "MO" your group will start to side against her.
>
> Although she has a[n] assigned eagle[61] lic[ense] she does not have a signed fork truck lic[ense]. We've placed her on every dock with a large variety of drivers. She

[59] Def. Stmt. of Facts [#34-8] at ¶ 25.
[60] Docket No. [#34-6] at ¶ 12.
[61] An eagle is a type of vehicle, somewhat like a golf cart, that was used to deliver parts.

does not have the ability to driver [sic] safely. The reason that she has been given so many try outs is because she likes to suit [sic] & also claims she's being treated unfairly. You need to keep good documentation.

When she gets back, the next step will be to pursue her fork truck lic[ense]. I'm assuming that failure to pass test will cause her to default from our dept. If you do train her, remember to note it on the Harvey ball charts, she often claims after each of her failures, "nobody told me." When doing the driver's lic[ense] test, have another sup[ervisor] with you. Have [her] stack & unstack in close quarter areas.

Call me if you'd like to talk more about this. Remember, her next penalty even will result in termination. She has served (2) "BOS + 30 days" already so please do not clear anything on her record.[62]

Plaintiff maintains that Klubek's purpose in sending this message, and his statement that she "likes to suit," was to encourage Hofstetter to retaliate against her. However, Plaintiff admits that Hofstetter treated her fairly, despite Klubek's email. For example, in her affidavit, Plaintiff states, "Jack Hofstetter evaluated Plaintiff's job performance and found no need for further disciplinary action."[63] Further, at her deposition, Plaintiff testified that Hofstetter disagreed with Klubek's characterization of her as a bad employee: "Wally was stressing all of these things and Jack, the third shift foreman said he didn't understand what Wally's problem was because I was not the problem child."[64] Additionally, under Hofstetter's supervision Plaintiff obtained her forklift license, contrary to Klubek's expectation. Moreover, Plaintiff concedes that Hofstetter took no disciplinary action against her, and that neither Klubek nor Hofstetter was involved in the later decision to

---

[62] Docket No. [#44-7] at pp. 2-3.
[63] Docket No. [#44-2] at p. 10, ¶ 64; *see also*, Docket No. [#44-15] at pp. 32-33, Pl. Dep. at pp. 241-242 ("Jake Hoffstetter said that he reserved the right to form his opinion about the people who worked for him and it wouldn't matter if was a complaint or not. He was going to evaluate me on my actions and activities on the job, not passed on information.").
[64] Docket No. [#34-3] at p.31, Pl. Dep. at p. 232.

terminate her employment.[65]

In any event, shortly after Plaintiff's transfer to GCS 3rd shift, on July 28, 2014, she filed a complaint with the NYSDHR,[66] her second, alleging that the discipline that she had received prior to transferring to GSC 3rd shift (and the scrutiny that she received immediately after her arrival on 3rd shift) had been in retaliation for her prior NYSDHR complaint against GMCH in 2012. In the NYSDHR complaint, Plaintiff summarized her claim as follows:

> I believe that I was retaliated against by my employer because the process in both places [(presumably referring to GMCH and GM)] was the same; stalked by fellow employee – then harassment and intimidation by a fellow employee. I was followed around on the job; then they redid the job to see if I had done it properly; followed by complaints about the quality of my work. The intimidation and bullying started after the court case was settled. The process of being put on notice started when I brought the bullying to management's attention. [Referring to her complaint against Joelle] I was walked out even though I had witnesses that said the notices had no foundation. The group leaders and foremen talked to each other and they have continued the bullying.[67]

When asked to specify on the form complaint who had retaliated against her, Plaintiff listed four individuals: "Wally, General Foreman," apparently referring to Klubek, "Matt, Group Leader," apparently referring to Kirkendale, "Paul, General Foreman" and "Kevin Sullivan, Group Leader." However, the factual narrative of Plaintiff's complaint focused primarily on her two co-workers, Joelle and Terry, who Plaintiff maintained had harassed her. For example, Plaintiff alleged that it was Joelle who falsely accused her of assault, and that it was Joelle and Terry who reported that she had been inside of her machine

---

[65] Pl. Aff. at ¶ 59 ("Hofstetter wasn't involved in Plaintiff's termination.").
[66] Docket No. [#34-5] at pp. 113-134.
[67] Docket No. [#34-5] at p. 116.

without using the proper lockout procedures.[68]  Plaintiff indicated that Joelle and Terry complained about her to Kevin Sullivan, who took their side.  According to Plaintiff, "if Joelle W. didn't get her way she complained to Kevin Sullivan (the group leader)[, and] Kevin found a way to justify anything Joelle [and Terry] did."[69]  Plaintiff's NYSDHR complaint further stated that after those incidents she transferred to the 3rd shift in Global Supply Chain, where her supervisors initially gave her work undue scrutiny, which she characterized as harassment.[70]  Plaintiff further indicated that other GSC drivers did not follow the rules, but that she would be singled out for discipline after following their example.[71]  NYSDHR eventually dismissed the complaint for lack of evidence.[72]

After Plaintiff filed her NYSDHR complaint, she continued to work in GSC 3rd shift without incident or, at least, without further disciplinary actions.[73]  However, approximately one year after Plaintiff began working on 3rd shift, and almost a year after she filed her NYSDHR complaint, a final incident occurred which resulted in the termination of her employment.  Specifically, on June 10, 2015, Plaintiff and a co-worker named Susan Thompson ("Thompson") were both operating their respective forklifts when they collided.  Significantly, at the time of the collision Plaintiff was operating her forklift with a double-

---

[68] Docket No. [#34-5] at p. 119.

[69] Docket No. [#34-5] at p. 127; *see also id.* ("Kevin S. has been justifying Joelle and Terry for weeks.").

[70] Docket No. [#34-5] at pp. 128-129 ("To be watched for a few hours each day is harassment.").

[71] Docket No. [#34-5] at p. 129 ("The other drivers don't want to work around me, they feel there is too much observing being done. . . . [T]hey show me how the job needs to be done and it is in direct conflict with all the things [rules] I have been walked out for.  Drivers set and take calls out of turn.  Drivers do jobs when they are not on the screen.  Drivers don't use the screen at all and their partners keep the screen clear.  Drivers move parts at their skill level not according to the rules.").

[72] Def. Stmt. of Facts [#34-8] at ¶ 62.

[73] *See, e.g.,* Pl. Aff. at ¶ 64 ("The discrimination/harassment stopped after Jodi West was replaced; Wally Klubek went out on sick leave; Matt Kirkendale was transferred to a new plant; Plaintiff was transferred to third shift; Kevin Sullivan was removed from Head Machine Floor; and Jack Hofstetter evaluated Plaintiff's job performance and found no need for further disciplinary action.").

stacked load of parts, approximately four feet wide and eight feet high, in front of her field of vision.[74]   The fact is significant because GM training materials emphasize that employees who are transporting materials must not have a blocked view.[75]   In this regard, GM's "[s]afety practices require[d] an individual to drive in the direction that allowed for their view to be unobstructed."[76]   According to GM training, employees could operate a forklift with a double-stacked load, but they were supposed to either drive backward while looking backward, so as to be able to see where they were going, or, if going forward, to have another employee walk beside the forklift as a guide.[77]   Plaintiff admits that when GM trained her to operate a forklift, she was instructed that she needed to be able to "visually see while [she] was operating the forklift."[78]

When Thompson notified group leader Vincent Popielski of the incident, she acknowledged that the collision was a low-speed affair that had not resulted in personal injuries or damage to either forklift.   Nevertheless, Popielski, who was not aware that Plaintiff had filed a NYSDHR complaint,[79] determined that the incident was properly classified as a "sentinel event" under GM's safety policies, meaning that it had the

---

[74] *See*, Def. Stmt. of Facts at ¶ 29 ("On June 10, 2015, while Nicolia was driving forward with a double stacked load obstructing her vision, she came in contact with a fork lift truck being driven by another employee.").

[75] *See, e.g.*, Docket No. [#34-5] at p. 76 (Stating, as one example of a sentinel event, "Transporting materials with a blocked view of travel or blind spot interaction with pedestrians, equipment or vehicles.").

[76] Def. Stmt. of Facts [#34-8] at ¶ 30; *see also*, Popielski Dep. at p. 64, Docket No. [#34-5] at p. 57 ("What did Ms. Nicolia do that violated the safety rules, in your opinion?  A. Driving forward with her view obstructed completely.").

[77] Popielski Dep. at pp. 64, 65-66 ("It can happen in the event a large piece of equipment is being moved.  And in that event, they will have a ground man who will be clearing the way for the traffic and signaling to the driver whether to stop, move, turn.  So the person on the ground is directing the driver who can't see.").

[78] Pl. Dep. at p. 59.

[79]Popielski testified that he did not know Plaintiff had filed a complaint, *see*, Popielski Dep. at p. 14, and Plaintiff admitted at her deposition that she had no information to the contrary. *See*, Docket No. [#44-15] at pp. 33-34, Pl. Dep. at pp. 242-243 ("I have no idea what Vince did or didn't know.").

potential to be fatal or to cause very serious injury.[80]   In that regard, GM training documents state that "[a] sentinel event is, [a]n injury, near miss, property damage or unsafe act/condition that may result in death."[81]  Popielski reported the incident to GM as a sentinel event, and indicated that Plaintiff had caused the event by "[n]ot following standardized work (Driving forward with double stacked parts)."[82]   Plaintiff asserts that Popielski was wrong to treat the incident as a sentinel event since no one was *actually injured*, and no property was *actually damaged*.[83]   However, Plaintiff's unsupported assertion as to what constitutes a sentinel event, which she claims to have gained during unspecified on-the-job training, is not only hearsay, but is also clearly inconsistent with actual GM training documents explaining sentinel events.[84]

Although Popielski reported the incident as a sentinel event, that was not the purported basis for GM's termination of Plaintiff's employment. *See*, Popielski Dep. at p. 13 ("A sentinel event is not an accusation.").   Rather, as discussed further below, GM purportedly fired Plaintiff for violating CBA Shop Rule 18, "making scrap unnecessarily/careless workmanship,"[85] at a time when she was on her "last chance" at

---

[80] *See*, Docket No. [#34-5] at p. 61, GM Mobile Equipment & Pedestrian Safety Notice ("[H]azards that <u>could</u> lead to fatalities are known as Sentinel Events") (emphasis added); *see also*, Docket No. [#34-5] at pp. 60-76 generally, collecting GM training materials concerning sentinel events.

[81] *See*, Docket No. [#34-5] at p. 72.

[82] Docket No. [#44-11] at p. 2, Sentinel Event Data Sheet.

[83] *See, e.g.*, Pl. Dep. at 57 ("Q. Can you explain for the record, what is a sentinel event?  A. When you go to work and you leave at the end of the shift and you don't have – you don't return home in the same condition that you came to work."). Plaintiff maintains that she was given this definition at unspecified routine training meetings. Id. at pp. 57-58.

[84] *See, e.g.*, Docket No. [#34-5] at p. 61, GM Mobile Equipment & Pedestrian Safety Notice ("[H]azards that <u>could</u> lead to fatalities are known as Sentinel Events") (emphasis added).  With regard to her assertion that the incident was not a sentinel event, Plaintiff relies on Exhibit 13 to her affidavit. (Docket No. [#44-14 at p. 1-10).  However, that exhibit clearly does not establish the point that Plaintiff hopes to prove; indeed, the materials indicate that a sentinel event may include a potentially dangerous situation, such as where a drinking fountain is located too close to a forklift aisle, since the employee could potentially take a drink and then step into the forklift's path without looking. See, Docket No. [#44-14] at p. 4.

[85] Popielski initially indicated to Plaintiff that she was on notice for violating Shop Rule 36,

the final step of the progressive discipline policy.[86]

In this regard, after Thompson reported the incident to Popielski, Popielski immediately began an investigation, which included interviewing Plaintiff and Thompson about the incident. Plaintiff and Thompson both told Popielski essentially the same basic facts: Thompson and Plaintiff had both been operating their forklifts in the same aisle, when Plaintiff asked Thompson where she was supposed to deliver the double load of parts on her forklift; Thompson told Plaintiff where to take the parts, after which Thompson continued up the aisle and began making a right turn into a side lane, though Thompson and Plaintiff disagree as to whether Thompson completed the turn[87] -- Thompson told Popielski that the collision occurred as she was turning, while Plaintiff maintains, based on what she observed after the collision, that Thompson made the turn but then backed partially out into the aisle;[88] and Plaintiff, without seeing Thompson's forklift in front of her, removed her foot from the brake an moved forward, contacting Thompson's forklift.

Regarding Plaintiff's ability to see while operating the forklift, she told Popielski that she had been looking around the side of the load, but did not see Thompson. On this point, Plaintiff indicated that her ability to see had been hampered by some problem with the forklift's seat, and by unspecified "physical issues."[89] Popielski asked Plaintiff why she was not driving backward and looking in that direction, so that her view would not be

---

"Disregard of safety rules and common practices," but Plaintiff was ultimately sanctioned for violating Shop Rule 18. The reason for this is not explained in the record, but the record indicates that forklift accidents were sometimes treated under Shop Rule 36 and sometimes treated under Shop Rule 18, even when there was no damage caused.

[86] *See*, Docket No. [#34-5] at p. 26, "Notice of Disciplinary Action."

[87] *See*, Popielski's interview notes, Docket No. [#34-5] at pp. 27-28.

[88] Plaintiff admitted at her deposition that she did not actually see Thompson back out of the aisle, and that she merely deduced that from what she observed Thompson do after the collision.

[89] *See*, Interview notes, Docket No. [#34-5] at p. 31 ("Was leaning out of right side and did not see Sue pulling out. Claims there is issue with truck seat and she has some physical issues as well.").

obstructed, and Plaintiff "first stated that aisle 31 was too busy with traffic[,] and then said F aisle was not wide enough for a 3 point turn,"[90] but Popielski testified in this action that the reasons Plaintiff gave would not have prevented her from turning around and driving in reverse.[91]

During Plaintiff's investigative interview, she acknowledged to Popielski that she had driven the forklift in a forward direction, with the double load in front of her, a distance of approximately 75 feet, prior to the contact between the two forklifts.[92] However, Plaintiff maintains that such fact is irrelevant, since she was not driving forward in this manner *immediately prior to* the contact between the two forklifts. As to this point, Plaintiff denies that her forklift "struck" Thompson's forklift, preferring to describe what happened as, follows: "I was parked and I took my foot off the brake and there was an impact. I was not driving anything when the incident occurred."[93] Alternatively, Plaintiff states, "I took my foot off the brake and it rolled and she was parked in front of my fork truck and she shouldn't have been there."[94] In other words, Plaintiff describes a situation in which she removed her foot from the brake of her forklift, allowing the forklift to move and make contact with Thompson's forklift,[95] but in which she denies having "driven" the forklift.[96]

---

[90] Popielski email, Docket No. [#34-5] at p. 30.
[91] Popielski Dep. at p. 60 ("She stated that, but I don't agree.").
[92] Pl. Dep. at pp. 205-206.
[93] Pl. Dep. at p. 197.
[94] Pl. Dep. at p. 197.
[95] Pl. Dep. at p. 197 ("I took my foot off the brake and it rolled and she was parked I front of my fork truck and she shouldn't have been there.")
[96] Plaintiff has made conflicting statements concerning whether Thompson's forklift was moving at the time of contact. For example, Plaintiff suggests that Thompson's was the only forklift moving at the time of contact, implying that Thompson was moving in reverse, *see*, Pl. Dep. at p. 198 ("She was the only one moving"), while simultaneously asserting that Thompson's forklift could not have been moving backward, since she observed no back-up signal and no back-up lights from Thompson's forklift, see, Pl. Dep. at p. 200. Further contradicting any contention that Thompson was moving at the time of the collision, Plaintiff testified that at the time of contact, Thompson had already backed her forklift into the main aisle and was stopped, looking up at a sign. *See*, Pl. Dep. at p. 200; *see also, id.* at p. 198 ("She was sitting

Upon being notified of the event, GM labor relations representative John Caporuscio ("Caporuscio") performed his own investigation and concluded that Plaintiff had been aware of GM's safety rules/practice but had failed to follow them, referring to Plaintiff's decision to drive the forklift with her vision obstructed.[97]  Caporuscio therefore made the decision to terminate Plaintiff's employment.

Plaintiff maintains that such determination was unfair and incorrect, since the collision was not serious and was not her fault in any event.  In this regard, Plaintiff's deposition testimony establishes her version of events as follows:  Plaintiff was operating her double-loaded forklift in a forward direction with the load in front of her, though she contends that she could see around the load;  the area in which Plaintiff and Thompson were operating was comprised of a main "storage aisle" with "storage lanes" going off to the side;[98] only one forklift was supposed to be in the storage aisle at any given time, and any forklift in the storage aisle automatically had the right of way over any forklift in the storage lanes;[99] Plaintiff's forklift was already in the storage aisle, stopped, when Thompson entered the aisle, which was a rule violation by Thompson;[100] Plaintiff and Thompson spoke to one another about the destination for Plaintifff's load, after which Thompson continued up the storage aisle and turned into a lane, where she should have remained until Plaintiff's forklift, which was still in the storage aisle, left the storage

---

there."); *see also, id.* at p. 197 ("she was parked").
[97] Caporuscio Aff. [#34-4] at ¶ 29.
[98] Pl. Dep. at p. 198.
[99] Pl. Dep. at p. 198-199.  Again, while this was Plaintiff's understanding, she points to nothing in the record that actually supports this understanding or that shows that such a rule existed.  Instead, she vaguely states that she learned this rule during "on the job training." Pl. Dep. at p. 199.
[100] Pl. Aff. at ¶ ¶ 29, 34..

aisle;[101] however, Thompson's forklift was still partially in the storage aisle;[102] at that point, both forklifts were stopped very near each other, though Plaintiff could not see that Thompson's forklift was in front of hers; and finally, intending to begin moving forward, Plaintiff took her foot off the brake, but before she pressed the accelerator the forklift rolled forward, making contact with Thompson's forklift.[103]

Plaintiff maintains that even though Thompson was sitting still at the moment of impact, the collision was Thompson's fault because she had stopped in an impermissible location.[104]  In sum and substance, Plaintiff maintains that the collision could not have been her fault, and that the manner in which she was operating her forklift was not unsafe, since she had the right of way and Thompson had no business being in the storage aisle at the time of contact.  Indeed, Plaintiff insists that she did nothing wrong concerning the collision.[105]  Plaintiff cites no written policies or procedures in support of her understanding of the rules governing forklift traffic, but instead apparently relies on her understanding of what she was told by unspecified persons during training.  In other words, Plaintiff relies on unattributed hearsay.

Following her termination, on July 20, 2015, Plaintiff filed another complaint with NYSDHR, again alleging retaliation.[106]  Plaintiff alleged that GM retaliated against her for her prior NYSDR complaint, which had been filed almost a year earlier, by "us[ing] a

---

[101] Pl. Dep. at p. 199 ("Once she moved into the storage lane, then she should have sat there until I was out of the aisle, however long it took.").

[102] Plaintiff speculates that Thompson did so, but did not actually witness Thompson back her forklift into the aisle.

[103] Pl. Dep. at pp. 197-

[104] Pl. Dep. at p. 201 ("She created a situation where the impact happened."); *see also*, Pl. Dep. at p. 197 ("I took my foot off the brake and it rolled and she was parked I front of my fork truck and she shouldn't have been there.").

[105] Pl. Dep. at p. 208-209 ("Q. Did you do anything wrong?  A. No.").

[106] *See*, NYSDHR Complaint, Docket No. [#34-5] at p. 138.

relatively minor workplace accident in which there were no injuries as a pretext for removing [her] from [her] career at GM."[107]  NYSDHR eventually dismissed the complaint for lack of evidence, and, on March 3, 2016, issued Plaintiff a right-to-sue letter.[108]

On June 1, 2016, Plaintiff commenced this action, asserting retaliation under Title VII.  On February 1, 2017, Plaintiff filed an Amended Complaint.  The pleading asserts that Defendant began retaliating against Plaintiff "almost immediately" after she began working in the Tonawanda plant in retaliation for her 2012 NYSDHR complaint, through a series of "frivolous" disciplinary actions.[109]

Following the completion of pretrial discovery, on February 16, 2018, Defendant filed the subject motion for summary judgment.  With regard to whether Defendant had notice of Plaintiff's protected activity, Defendant acknowledges that Plaintiff filed the two aforementioned NYSDHR complaints prior to being fired,  but contends that Plaintiff "lacks any competent evidence to establish that the group leaders involved in the disciplinary decisions [(Sullivan, Kirkendale and Popielski)] were aware of her complaints."[110] With regard to the issue of causation, Defendant asserts that Plaintiff cannot rely on temporal proximity to establish a causal nexus, since there is a 3-year gap between her first complaint and her firing, and an 11-month gap between her second complaint and her firing.  Defendant further contends that Plaintiff cannot establish a causal connection between her complaints and the disciplinary actions, since most of the disciplinary actions against her were initiated by complaints from co-workers, not supervisors,[111] and she has

---

[107] NYSDHR Complaint, Docket No. [#34-5] at p. 140.
[108] Def. Stmt. of Facts [#34-8] at ¶ 63.
[109] *See, e.g.*, Amended Complaint at ¶ ¶ 15-17, 33
[110] Def. Memo of Law [#34-1] at p. 5.
[111] The machine head double-cut incident and the incident involving Plaintiff pressing the job button

not shown that those coworkers were aware of her complaints or were in cahoots with her supervisors.  Defendant further maintains that Plaintiff has no evidence of retaliatory animus by Popielski, who investigated the final disciplinary incident, or by Caporuscio, who made the decision to terminate Plaintiff's employment.  For these reasons, Defendant maintains, Plaintiff cannot demonstrate a *prima facie* case.

Alternatively, Defendant asserts that even if Plaintiff can establish a *prima facie* case, Defendant has come forward with a legitimate non-retaliatory reason for terminating her employment (she was a bad employee who did not follow the rules), and Plaintiff has not raised a triable issue of fact as to whether retaliation was a "but for" cause of her firing.  In that regard, Defendant contends that Plaintiff cannot show that the she was treated differently than other similarly-situated employees who had not engaged in protected activity.   Rather, Defendant has submitted evidence that other employees were disciplined for violating the same rules as Plaintiff, and that to the extent those employees were not terminated, or punished at all, Plaintiff has not shown that they were similarly situated to her in terms of their disciplinary records or the circumstances of their rule violations.

In response, Plaintiff maintains that the element of notice is satisfied because GMCH and GM are the same company.  With regard to causation, Plaintiff maintains that she can rely on temporal proximity to establish that element, since the disciplinary actions against her began shortly after she settled her first NYSDHR complaint, "within about two months after the settlement."[112]  In this regard, Plaintiff uses the date of the settlement of

---

are exceptions, as it appears that those two disciplinary incidents were initiated by supervisors.
    [112] Pl. Memo of Law [#44] at p. 3.  Plaintiff admits that she is relying on temporal proximity to establish causation as part of her prima facie case.Pl. Memo of Law [#44] at pp. 14-17.

her first complaint, not the date of the filing of the complaint.  As to showing that retaliation was a but-for cause of her firing, Plaintiff essentially offers two arguments:  First, that the forklift-collision was falsely labeled as a sentinel event, since there was no damage to the forklifts;[113] and second, that other GM employees (who had not engaged in protected activity) who committed safety violations were not disciplined as harshly or at all.

On December 13, 2018, counsel for the parties appeared before the undersigned for oral argument.  Most of the argument focused on whether Plaintiff could establish the causation element of her *prima facie* case.  Plaintiff acknowledged that she had no direct evidence of causation, and that she was relying on temporal proximity and disparate treatment of Plaintiff as compared to other employees who had not filed complaints.  With regard to temporal proximity, Plaintiff admitted that she was using the date of her settlement with GMCH in August 2013 as the starting point, and that if she was forced to rely on the date of her complaint in 2012, she could not establish temporal proximity.  The Court indicated its belief that Plaintiff could not rely on the settlement date, citing *Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545 SJF GRB, 2014 WL 1154056, at *4 (E.D.N.Y. Mar. 20, 2014), which in turn relied on the Second Circuit's ruling in *Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012).

Plaintiff alternatively indicated that she was relying on disparate treatment to establish causation indirectly.  As to this argument, Plaintiff referred specifically to disparate treatment involving Plaintiff's forklift collision as compared to other similar incidents.  In particular, Plaintiff's counsel cited Popielski's deposition testimony, which

---

[113] Pl. Memo of Law at pp. 17-18 ("In respect of the alleged "Sentinel Event" (which was, in actual fact anything BUT a Sentinel Event), there was literally no damage to the vehicles involved in the minor collision.").

he maintained showed that other similar incidents had not been classified as sentinel events and had not resulted in an employee's termination. In particular, Plaintiff's counsel cited an incident involving an employee named Otis Caldwell ("Caldwell") who, according to Popielski's testimony, was injured when he walked into the path of a moving forklift.[114] Popielski testified that Caldwell had not been disciplined, and that at the time he was more concerned about Caldwell's injuries than about disciplining him. Nevertheless, Plaintiff's counsel asserted that the Caldwell incident indirectly established that the termination of Plaintiff's employment amounted to disparate treatment. The Court pointed out, however, that for disparate treatment to apply, Plaintiff would need to show that she and the comparator employees were similarly situated in all material respects, including with regard to disciplinary records, and that Plaintiff had not made such a showing. Indeed, the record contains no evidence concerning the disciplinary records of the employees to whom Plaintiff compares herself.

The Court next asked how, assuming that Plaintiff could establish a *prima facie* case, she had shown, notwithstanding Defendant's proffered reason for terminating her employment, that retaliatory animus was a but-for cause of her adverse employment action. Plaintiff's counsel responded that "it all comes down to a comparison of the facts of her [Plaintiff's] alleged sentinel event and others," and that since Plaintiff was treated more severely, by inference one could assume there was an ulterior motive.

---

[114] To the extent that Plaintiff may also be arguing that Caldwell's accident was not classified as a sentinel event, she has not shown that such term was even in use at the time of Caldwell's accident.

DISCUSSION

Plaintiff contends that Defendant retaliated against her in violation of Title VII. The basic principles applicable to the claim are clear:

> To make out a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. Once a *prima facie* case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action. If the employer demonstrates such a reason, the burden shifts back to the plaintiff to adduce evidence from which a rational finder of fact could infer that the desire to retaliate was the but-for cause of the challenged employment action.

*Russell v. Aid to Developmentally Disabled, Inc.*, No. 17-3417, 2018 WL 5098819, at *3 (2d Cir. Oct. 18, 2018) (citations and internal quotation marks omitted); *see also, Canady v. Univ. of Rochester*, 736 F. App'x 259, 262 (2d Cir. 2018) ("Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework, which requires defendants to respond to a plaintiff's prima facie case by providing a legitimate, non-retaliatory reason for the adverse employment action. A plaintiff must then show that the employer's retaliatory motive was a but-for cause of the adverse action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.") (citations omitted).

Under Title VII, the plaintiff's burden to establish a *prima facie* case is *de minimis*. *See, e.g., Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) ("[T]he burden for establishing a *prima facie* case of retaliation is '*de minimis*.'").

In the instant case, it is undisputed that Plaintiff engaged in protected activity, and that she suffered an adverse employment action. The parties disagree, however, as to whether Plaintiff can establish the second and fourth elements of her *prima facie* case.

With regard to the second element (awareness by the employer of the protected activity), for purposes of a *prima facie* case the plaintiff is not required to show that the person who made the adverse employment action was personally aware of her protected activity; rather, "a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000)). Under the facts of this case, including Plaintiff's contention that GMCH and GM are related companies, as well as West's acknowledgement that she became aware of Plaintiff's NYSDHR complaint against GMCH at some unspecified point,[115] the Court finds that Plaintiff has satisfied the notice element of her *prima facie* case.

However, general corporate knowledge is insufficient to establish the "causation" element of a *prima facie* retaliation claim,[116] and

> evidence that the specific decisionmakers responsible for the adverse action were *not* aware of the plaintiff's protected activity is still relevant as some evidence of a lack of a *causal connection*, countering plaintiff's circumstantial evidence of proximity or disparate treatment.

*Weber v. City of New York*, 973 F. Supp. 2d 227, 272 (E.D.N.Y. 2013) (quoting *Gordon v. N.Y.C. Bd. Of Educ.*, 232 F.3d at 117, emphasis added, internal quotation marks

---

[115] West Aff. at ¶ 9, Docket No. [#34-6] at p. 3.
[116] *See, Zann Kwann*, 737 F.3d at 844, n. 4 (Indicating that a retaliation plaintiff "cannot satisfy the causation prong through mere corporate knowledge.").

omitted); *see also, Sandler v. Montefiore Health Sys., Inc.*, No. 16-CV-2258 (JPO), 2018 WL 4636835, at *12 (S.D.N.Y. Sept. 27, 2018) ("[A]lthough the complaint to Skae technically constitutes general corporate knowledge to establish defendants' awareness of the protected activity, the *decision-makers' lack of notice essentially eviscerates the causation element of the claim* that the November 16 decision was retaliatory.") (emphasis added; citations omitted).

At the same time, though, a retaliation plaintiff can establish the causation element of her *prima facie* case even without showing that the person who made the adverse employment action was aware of her protected activity. On this point the Second Circuit

> has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.

> The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment. *A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities*, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge. This is so, moreover, regardless of whether the issue of causation arises in the context of plaintiff's satisfaction of her *prima facie* case or as part of her ultimate burden of proving that retaliation [was a but-for cause of the alleged adverse action by the employer].[117]

---

[117]*See, Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action," as opposed to merely being a motivating factor). "But-for' causation does not, however, require proof that retaliation was the *only* cause of the employer's action, but only that the adverse action *would not have occurred in the absence of the retaliatory motive*." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir.2013) (emphasis added, internal quotation marks omitted).

*Gordon v. New York City Bd. of Educ.*, 232 F.3d at 117 (emphasis added, citations omitted).

However, for temporal proximity to apply, the proximity "must be very close," though "there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). The Second Circuit has indicated that a five-month gap might be close enough to establish causation at the *prima facie* stage, *Abrams*,764 F.3d at 254, but that a 10-month gap is not sufficient to establish a causal nexus based on temporal proximity. *See, e.g., Hazelwood v Highland Hospital*, 763 F.App'x 60, 63 (2d Cir. Mar. 1, 2019); *see also, Nicastro v. New York City Dept. of Design and Const.*, 125 F. App'x. 357, 358 (2d Cir. Mar. 14, 2005) (10 months not close enough to meet *de minimis* burden at *prima facie* stage).

When calculating temporal proximity for purposes of establishing causation in a retaliation action, the period is measured between the date the employer receives notice of the plaintiff's protected activity and the date of the adverse employment action. *See, Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) ("[T]his period is measured from the date of the employer's knowledge of the protected activity."). So, for example, where an employee settles or otherwise resolves a discrimination claim against her employer and then allegedly suffers retaliation, the date for calculating temporal proximity runs from the date the employer received notice of the complaint, not the date of the

settlement or resolution of the employee's claim. *See, Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545 SJF GRB, 2014 WL 1154056, at *4 (E.D.N.Y. Mar. 20, 2014) (Observing that in *Kim v. Columbia Univ.*, the Second Circuit "reject[ed] the plaintiff's argument on appeal 'that the temporal proximity between [the alleged adverse action in May 2007] and the April 2007 *settlement proceedings* in his then-pending discrimination case was sufficient to permit an inference of retaliation' and finding that the relevant period for purposes of determining temporal proximity began to run from the date the plaintiff filed his discrimination claim in federal court, or even earlier, when he initially filed a complaint against his employer with the EEOC, as that is when the employer learned of the protected activity.") (emphasis added).[118]

However, when an employee engages in multiple acts of protected activity, he may rely on temporal proximity to establish causation for purposes of a *prima facie* case if an adverse employment action follows swiftly after any one of those acts of protected activity, even if it is not the first such act. *See, Treglia v. Town of Manlius*, 313 F.3d 713, 720–21 (2d Cir. 2002) ("The Town argues that the first allegedly retaliatory action after Treglia filed his administrative charges in April 1997 did not occur until almost a full year later in March 1998. That argument, however, ignores Treglia's protected activity between those two dates. For example, Treglia asserts that in February 1998 the NYDHR requested that he submit a list of witnesses who could corroborate his charges of discrimination, after

---

[118] *But see, Pena-Barrero v. City of New York*, 726 F. App'x 31, 35 (2d Cir. Mar. 7, 2018) (In which the Second Circuit did not comment on the plaintiff's attempt to measure between the date of settlement and the date of the adverse employment action: "Pena-Barrero would have us draw an inference of retaliation based on the close temporal proximity between the settlement of his first lawsuit and his subsequent termination, but an inference of retaliation does not arise where, as here, timing is the only basis for a claim of retaliation.") (citation to record omitted).

which he told several members of the department that they might be contacted as part of the NYDHR investigation. The temporal proximity between this protected activity in February 1998 and the allegedly adverse employment actions in March 1998 is sufficient to establish the required causal link for a *prima facie* case.").[119]

As for disparate treatment, where a retaliation plaintiff relies upon disparate treatment of fellow employees to prove causation indirectly, he must show that he is similarly situated to the fellow employees in all material respects. *See, Mooney v. City of New York*, No. 18CV328(DLC), 2018 WL 4356733, at *3 (S.D.N.Y. Sept. 12, 2018) ("A plaintiff can meet the burden of pleading causation by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination. . . . [For example,] a plaintiff may allege disparate treatment by pleading the more favorable treatment of employees not in the protected group, who are similarly situated in all material respects.") (citations and internal quotation marks omitted); *see also, Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 16-CV-6278 (VEC), 2018 WL 4625768, at *16 (S.D.N.Y. Sept. 26, 2018) ("Plaintiff provides no evidence that this employee was similarly situated to her in any material respect, including seniority, attendance, or disciplinary record.").

In the instant case, the issue, again, is whether Plaintiff has established the element of causation for purposes of her *prima facie* case. As previously mentioned,

---

[119] *But see*, *Redd v. New York State Div. of Parole*, 923 F. Supp. 2d 371, 389 (E.D.N.Y. 2012) ("[T]he court seriously doubts that every single activity a plaintiff conducts in connection with an ongoing litigation can constitute a separate "protected activity" that would restart the causation clock; if that were true, just about any adverse employment action taken during a lengthy discrimination case could be considered the result of retaliatory animus."); *see also, Stern v. State Univ. of New York*, No. 16CV5588NGGLB, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018) (Indicating that an employee's "separate activities stemming out of one litigation" will not re-start the temporal proximity clock, but new and "separate complaints registered at increasingly senior levels" of the company will.).

Plaintiff maintains that she can rely on temporal proximity to establish that element, since the disciplinary actions against her began shortly after she settled her first NYSDHR complaint, "within about two months after the settlement."[120]  However, in light of the legal principles discussed in the preceding paragraphs, the date of settlement is not the correct starting date when evaluating temporal proximity.  Rather, the correct date is the date that Defendant (GM/GMCH) received notice that Plaintiff had filed the Complaint, which was in or about June 2012, more than a year before the disciplinary actions began at Tonawanda.[121]  Plaintiff therefore cannot rely on temporal proximity between her first NYSDHR complaint and the disciplinary actions in the fall of 2013 to establish the causation element of her *prima facie* case.

Nor can Plaintiff rely on either the filing of her NYSDHR in June 2012 or the settlement of that claim in August 2013 to establish a causal nexus with regard to the disciplinary action against her in March 2014.  The time between those dates is too great, even if one were to use the settlement date as a legitimate starting point when calculating temporal proximity, which this Court does not.  Similarly, there is no close temporal nexus between Plaintiff's second NYSDHR complaint in July 2014 and the termination of her employment in June 2015.  Accordingly, Plaintiff cannot rely on temporal proximity to establish the causation element of her *prima facie* case, for the purpose of defeating Defendant's summary judgment application.

Nor can Plaintiff rely on disparate treatment to establish this element, since she has produced no evidence of disparate treatment.  On this point, Plaintiff asserts that

---

[120] Pl. Memo of Law [#44] at p. 3.  Plaintiff admits that she is relying on temporal proximity to establish causation as part of her prima facie case.Pl. Memo of Law [#44] at pp. 14-17.

[121] Again, Plaintiff maintains that GMCH and GM are the same company for purposes of notice.

other employees, such as Otis Caldwell, violated safety rules but were either not disciplined or not terminated. However, Plaintiff has not shown that she was similarly situated to such employees in all material respects, or even that she was similarly situated with respect to her disciplinary record.

For all of these reasons, Plaintiff has failed to establish the causation element of her *prima facie* case, which entitles Defendant to summary judgment.

However, even assuming *arguendo* that Plaintiff could establish her *de minimis prima facie* case, the Court alternatively finds that Defendant has come forward with a legitimate non-discriminatory reason for its actions, and that Plaintiff has not come forward with evidence that retaliation was a but-for cause of her adverse employment action.

In this regard, Defendant maintains that it terminated Plaintiff's employment because she committed a disciplinary infraction when she was already on her "last chance" at the final step of the progressive discipline procedure under the CBA. Specifically, Defendant contends that Plaintiff violated a shop rule by driving her forklift when her vision was obstructed. Plaintiff contends that this reason is pretextual, which suggests that a but-for cause of her firing was retaliation. However, as proof of this, Plaintiff relies on her unsupported contention that the forklift collision did not amount to a sentinel event, which, as already discussed, is clearly inconsistent with GM documents explaining sentinel events, and on her bald assertion that she was treated disparately, which she has failed to support with evidence that she and the comparator employees were similarly situated. Plaintiff's attempted showing in this regard is not sufficient to raise a triable issue of fact.

[39]

With regard to the alleged pretextual nature of Defendant's proffered reason, Plaintiff also broadly asserts that she never violated any rules while employed by GM, and that each and every disciplinary action against her was baseless, which, she maintains, suggests that Defendant was motivated by retaliatory animus.  As a corollary to this argument, Plaintiff also maintains that in each and every instance that she was disciplined under the CBA, her union failed to properly represent her, though she fails to offer any reason for this.  However, Plaintiff's bald assertion in this regard is refuted by the record, which indicates that even if Plaintiff was actually innocent of most of the infractions for which she was disciplined, Defendant at least had a good reason to believe that she was guilty.  For example, with regard to the confrontation and alleged assault involving Joelle, Defendant had multiple witnesses indicating that the two women had an angry, loud and disruptive confrontation in the workplace, for which both women were disciplined.  Similarly, when defendant disciplined Plaintiff for being inside of her machine without locking out the power, it did so based on the statement of an alleged eyewitness. Further, when Plaintiff was disciplined for improperly re-entering parts into the machining process, she admits that she had re-entered parts, though she denies that she did so improperly.  And with regard to the incident in GSC Shift 2, Plaintiff admits that she was disciplined for an actual event (she pushed the button on the dolly), though she maintains that she was it was acceptable to do so, based on what she was told by unspecified co-workers or supervisors.  Finally, with regard to the forklift collision, Plaintiff admits that she told Popielski that she had driven her forklift in a forward direction a distance of 75 feet, under circumstances in which Defendant could easily conclude that Plaintiff's vision had been obstructed. Indeed, Plaintiff admitted that she did not see Thompson's forklift

at the time of collision, even though it had been right in front of her. In sum, Plaintiff's blanket denial of wrongdoing is not sufficient to defeat summary judgment. *See, e.g., Ward v. Connecticut Dep't of Pub. Safety*, No. CIV.306CV01936PCD, 2009 WL 179786, at *8 (D. Conn. Jan. 21, 2009) ("Plaintiff argues a pattern of unwarranted discipline as evidence of pretext. However, Plaintiff is unable to show, and has no evidence besides his own beliefs and statements, that any other investigations or disciplinary actions against Plaintiff were pretextual.").

Finally, to the extent that Plaintiff is attempting to rely on Klubek's email to Hofstetter to defeat summary judgment, the effort must fail since there is no evidence whatsoever that the email had any effect on any disciplinary action that she sustained. Indeed, Plaintiff admits that Hofstetter never disciplined her, and that Hofstetter rejected Klubek's opinion of her abilities. Additionally, the only disciplinary action that Plaintiff sustained after Klubek wrote the email was the termination of her employment, which occurred more than a year later under circumstances that did not involve Klubek or Hofstetter. Neither has Plaintiff shown that Popielski or Caporuscio had any knowledge of the email or of Klubek's opinion of Plaintiff.[122] In any event, Klubek's email does not express retaliatory animus. Instead, the email expresses the opinion that Plaintiff was a poor employee who was utterly incapable of driving safely, and who habitually blamed her shortcomings on others and on alleged failures to train her. Accordingly, Klubek advised Hofstetter to keep good records, and specifically records involving training, since

---

[122] In her affidavit submitted in opposition to summary judgment, *see*, Pl. Aff at ¶ 56, Plaintiff now maintains that Caporuscio and Popielski retaliated against her, even though at her deposition, at which Caporuscio was present and Popielski was discussed at length, when asked to name all the people who had retaliated against her she failed to name either Popielski or Caporuscio.

he believed it was inevitable that Plaintiff would eventually be removed from GSC due to her lack of skills, at which point she would attempt to claim that had not been trained properly. Although Klubek urged Hofstetter not to cut Plaintiff any breaks with regard to discipline, no reasonable inference can be drawn that he did so out of retaliatory animus, or that he was encouraging Hofstetter to retaliate against Plaintiff. Rather, it is readily apparent from the text of the email that Klubek viewed Plaintiff as a divisive employee who, due to her behavior and lack of skills, would eventually fail on her own if the disciplinary process was followed. Klubek merely requested that Hofstetter not deviate from the disciplinary procedure. However, regardless of Klubek's intent, Plaintiff has not shown that his email to Hofstetter had any effect on her employment.

For all of the foregoing reasons, Defendant is entitled to summary judgment.

CONCLUSION

Defendant's motion for summary judgment [#34] is granted, and this action is dismissed. The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated: Rochester, New York
        October 3, 2019

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge